IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:19-CV-00312-GCM

| | |
|---|---|
| WEST INVESTMENT FOREIGN SHARES, LLC, FIDUS INVESTMENT CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> DANIEL A. MCCOLLUM, GROVE 1005, LLC, JOHN SHAW, MCCOLLUM BUSINESS, LLC, <br><br> Defendants. | **ORDER** |

**THIS MATTER** comes before the Court on five motions to dismiss (ECF No. 65, 69, 74, 78, 80). The parties also filed supplemental jurisdictional briefing at the request of the Court.[1] *See* ECF No. 122–26. These motions are now ripe for disposition. Having carefully reviewed the parties' arguments and the applicable authorities, the Court will dismiss Defendant Daniel McCollum's counterclaims and third-party claims and will deny Defendants' motions to dismiss Plaintiffs' fraudulent conveyance claims.

I.  BACKGROUND

This is a case about corporate mismanagement. In the main collection action, loan collateral agents Fidus Investment Corporation and West Investment Foreign Shares (collectively "Fidus") seek to enforce a $10 million personal guarantee made by Dr. Daniel McCollum, and to set aside

---

[1] The parties did not previously plead their LLC members' citizenship. Following the parties' supplemental briefing, the Court is satisfied of complete diversity in this case.

allegedly fraudulent conveyances made by McCollum-owned entities to other defendants. McCollum counterclaims against Fidus and impleads various third-party defendants, alleging that Fidus and the third-party defendants hijacked his business and mismanaged it into the ground, thereby triggering his personal guarantee.

### a. The Loan

Defendant Daniel McCollum, a doctor, founded Oaktree Medical Center, P.C. (OMC). ECF No. 117 ¶ 7. OMC operated pain management clinics throughout the Carolinas and Tennessee. *Id*. ¶ 12. In 2014, OMC financed expansion by obtaining a revolving loan. *Id*. ¶¶ 13–14. And McCollum personally guaranteed the loan, pledging $9.6 million in personal assets as collateral.[2] *See* ECF No. 48 ¶¶ 13; ECF No. 48-2 at 3.

In 2018, OMC became unable to make certain principal payments on the loan. ECF No. 66 ¶ 22. Plaintiff Fidus Investment Corporation, the loan collateral agent, exercised a contractual remedy in the loan agreement, sidelining Daniel McCollum from OMC's operations and appointing Third-Party Defendant Tim Daileader as OMC's day-to-day manager.[3] *See id*. ¶¶ 21–24. Daileader undertook to restructure the business. He hired Third-Party Defendant Huron Consulting Group and an outside law firm to spearhead the restructuring, hoping ultimately to refinance the loan. *Id.* ¶ 34. But in September 2019, OMC—along with other affiliated entities owned by McCollum—filed for Chapter 7 bankruptcy. ECF No. 117 ¶ 74.

---

[2] McCollum later incorporated another entity, Oaktree Medical Center, LLC, to manage the operations of OMC P.C., FirstChoice, and other entities. ECF No. 66 at 10–11.
[3] Daileader was affiliated with Drivetrain, LLC, also a third-party defendant. ECF No. 117 ¶¶ 3, 24.

2

b. **The Collection Action**

In July 2019, two months before OMC filed for bankruptcy, Fidus, the collateral agent, filed a collection action against McCollum.[4] ECF No. 1. Fidus sought to enforce the personal guarantee made by McCollum in OMC's loan agreement. McCollum counterclaimed, alleging violations of the North Carolina Unfair and Deceptive Trade Practices Act, breaches of fiduciary duty, constructive fraud, negligence, and civil conspiracy. He claimed that Fidus used its "control position to ruin" his business, thereby triggering his loan obligations under the guaranty.

Fidus moved to dismiss McCollum's counterclaims, arguing that were (1) facially implausible under the *Iqbal* pleading standard; (2) substantively derivative claims that McCollum lacked standing to assert; (3) non-cognizable under the legal standards of each claim; and (4) contractually waived.

c. **The Fraudulent Transfer Action**

Fidus later amended its claims to add three new defendants: John Shaw, Grove 1005, LLC, and McCollum Business LLC. According to Fidus, McCollum engaged in fraudulent transfers involving these three defendants in order to evade his loan obligations. Grove 1005's sole member was McCollum. And its only asset was an office building worth $3.5 million. McCollum transferred his interest in Grove 1005 to John Shaw. Shaw then allegedly caused Grove 1005 to sell the office building, and then loan money from the proceeds back to another McCollum entity, McCollum Business LLC.

Fidus and West argue that these two transactions were intended to impede their collection efforts. In their view, "[b]y transferring his interest in Grove 1005 to Shaw, and then having Shaw

---

[4] Fidus later amended its complaint to add a new collateral agent, West Investment Foreign Shares LLC ("West") as a plaintiff. West became the collateral agent for the loan in March 2020. ECF No. 48 ¶ 11.

3

'loan' him a large percentage of the value of Grove 1005's assets to one of his companies, McCollum has turned a valuable asset into a substantial liability." ECF No. 76 at 4. Defendants McCollum Business, Grove 1005, and John Shaw filed motions to dismiss. ECF No. 65; ECF No. 69.

### d. The Third-Party Complaint

McCollum filed a third-party complaint against Tim Daileader, his company Drivetrain LLC, and Huron Consulting Group, alleging, in substance, that the third parties "drove the business into the ground." ECF No. 88 at 3. He claimed that their conduct harmed him personally because it caused OMC to become insolvent, thereby making him liable on his personal guarantee of the loan. Daileader and Drivetrain moved to dismiss. ECF No. 78. Huron filed a motion to transfer to compel arbitration, and asked for dismissal in the alternative. ECF No. 80.

### e. Procedural History

The adjacency of this case to related bankruptcy and criminal proceedings has slowed the pace of this litigation. Most notably, a criminal prosecution against Dr. McCollum led to the stay of discovery and briefing on various motions to dismiss on April 28, 2021. ECF No. 96; ECF No. 100. That criminal case was resolved in December 2021. The Court then lifted the stay in January 2022, and ordered the completion of briefing on the various motions. ECF No. 104.

## II. DISCUSSION

### a. Standard of Review

A party may move for dismissal based on the complaint's failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). On a Rule 12(b)(6) motion, the Court does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016). Instead, the Court considers whether the

4

complaint contains "sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A court ruling on a Rule 12(b)(6) motion reviews the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded allegations. *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). Ordinarily, an allegation is "well-pleaded" if it contains "a short and plain statement" of the claim showing that the pleader is entitled to relief. *See* Fed. R. Civ. P. 8(a)(2). But the court need not accept as true unwarranted inferences, unreasonable conclusions, or arguments. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008); *see also Iqbal*, 556 U.S. at 678 ("Rule 8 . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.") And where a plaintiff alleges fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

### b. **South Carolina Law Governs the Claims at Issue**

Because the Court sits in diversity, it applies the substantive law of North Carolina, including North Carolina's choice of law rules. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The parties repeatedly clash about where North Carolina's choice-of-law rules point: to North Carolina, South Carolina, or New York. For reasons discussed in more detail below, South Carolina law governs the claims at issue.

#### i. *Lex Loci* Test

In North Carolina, matters affecting the substantial rights of the parties are determined by *lex loci*, or the law of the situs of the claim. *Boudreau v. Baughman*, 368 S.E.2d 849, 853–54 (N.C. 1988). North Carolina favors the use of this test in cases involving torts or tort-like claims. *SciGrip, Inc. v. Osae*, 838 S.E.2d 334, 343 (N.C. 2020). In such cases, the *lex loci* test points to "the

5

substantive law of the state where the injury or harm was sustained or suffered, which is, ordinarily, the state where the last event necessary to make the actor liable or the last event required to constitute the tort takes place." *Id.* (cleaned up).

For non-tort-related matters, North Carolina uses the "most significant relationship" test from the Second Restatement. *See id.* at 420; *see also Env't Holdings Grp., LLC v. Finch*, 21 CVS 14019, 2022 NCBC LEXIS 45, at *9–10 (N.C. Sup. Ct. 2022). Under that test, courts apply the law of the state with the most significant relationship to the claim in question, taking into consideration (1) the place where the injury occurred; (2) the place where the conduct giving rise to the injury occurred; (3) the domicile of the parties; and (4) the place where the relationship between the parties is centered. *Henry v. Henry*, 229 S.E.2d 158, 163 (N.C. 1979).

The parties disagree about two things: (1) where the "last event necessary" occurred in this case; and (2) whether fraudulent transfers are governed by *lex loci*, or another test.

### 1. *Lex Loci* Points to South Carolina Law

All of the parties appear to agree that *lex loci*, and not the "most significant relationship" test, govern most of their claims. However, the parties dispute the proper application of the test. McCollum, for example, argues that North Carolina law should apply to his counterclaims because the "final acts of injury" were (1) the filing of bankruptcy by Oaktree Medical Center, LLC in North Carolina;[5] and (2) the filing of this lawsuit in North Carolina. ECF No. 108 at 6; ECF No. 65 at 5–6. Fidus responds that South Carolina law applies to McCollum's counterclaims because (1) McCollum lived in South Carolina; (2) and he alleged that he was harmed in his individual capacity. ECF No. 75 at 6.

---

[5] OMC, LLC was a holding company for other entities, including OMC, P.C. Although it initially filed for bankruptcy in North Carolina, the bankruptcy action was transferred to South Carolina. *See In re Oaktree Medical Center, LLC*, No. 19-05154-hb (Bankr. D.S.C.).

6

The Court agrees with Plaintiffs and Third-Party Defendants that South Carolina law governs the claims at issue. As a reminder, *lex loci* points to the law "of the state where the injury or harm was sustained or suffered." *SciGrip*, 838 S.E.2d at 343. Ordinarily, this is "where the last event necessary to make the actor liable or the last event required to constitute the tort takes place." *Id*. Here, the injuries giving rise to the counterclaims and third-party claims at issue all transpired in South Carolina: McCollum claims that Fidus, Daileader, Drivetrain, and Huron all ran his South Carolina business into the ground, making him personally liable on the Guaranty in South Carolina.

### 2. South Carolina Law Also Governs Fidus' Fraudulent Conveyance Claim

McCollum Business, Grove 1005, John Shaw, and Fidus also debate whether a fraudulent transfer is a "tort-like claim" indicating the use of the *lex loci* test. Courts across the country are divided on the proper categorization of fraudulent transfers, and North Carolina courts have not definitively taken a position one way or another. *See Sheehan v. Saoud*, 650 F. App'x 143, 154 (4th Cir. 2016) (describing split in authority); *see also TrustCo Bank v. Matthews,* C.A. No. 8374-VCP, 2015 WL 295373, at *9 (Del. Ch. Jan. 22, 2015) ("Fraudulent transfers bear some resemblance to both tort and contract claims and do not fit neatly in either category."); *Gulf Coast Bank & Trust Co. v. Mingo Tribal Preservation Trust*, 2016 U.S. Dist. LEXIS 195181, at *11 (W.D.N.C. Aug. 25, 2016) (Voorhees, J.) (deciding that a fraudulent transfer claim was assignable because it appeared to arise out of contract).

Without taking any position on the appropriate characterization of a fraudulent transfer, the Court concludes that South Carolina law should apply because the *lex loci* test and the "most significant relationship" test point to the same place: South Carolina. Here, the challenged transfers took place in South Carolina, involved property in South Carolina, among parties

7

domiciled in South Carolina, and generally related to the alleged evasion of a contract executed in South Carolina.

### c. Analysis

The Court now turns to the substance of the parties' motions. Reaching only some of the arguments raised, the Court concludes that (1) McCollum's counterclaims should be dismissed for lack of standing; (2) that McCollum's third-party claims should also be dismissed for lack of standing and improper impleader; and (3) that the fraudulent transfer claim asserted by Plaintiffs should not be dismissed.[6]

### i. Stockholder Standing

Plaintiffs and Third-Party Defendants argue that McCollum lacks standing to bring claims that are, in substance, derivative corporate claims. The Court agrees.

As a general rule, a recovery based on corporate mismanagement belongs solely to the corporation. *See Johnson v. Baldwin*, 69 S.E.2d 585, 588 (S.C. 1952). There are two exceptions. First, stockholders can recover (1) if the alleged wrongdoers owe a fiduciary relationship to the shareholder and full relief to the shareholder cannot be had through a derivative action; or (2) if the shareholder's loss is "separate and distinct" from that of the corporation. *Rice-Marko v. Wachovia Corp.*, 728 S.E.2d 61, 65 (S.C. Ct. App. 2012) (citing *Brown v. Stewart*, 557 S.E.2d 676, 684–85 (S.C. 2001)).

---

[6] Fidus argued, for example, that McCollum's counterclaims were facially implausible in violation of *Iqbal* and contractually waived by the Guaranty. Third-Party Defendant Huron Consulting, LLC sought (as an alternative to dismissal) to compel arbitration. And Plaintiffs and the third-party defendants all argued that the various counterclaims and third-party claims failed to state a cause of action. Because the Court resolves the motions on other grounds, it has no occasion to consider these issues.

Citing North Carolina law,[7] McCollum argues that he meets both exceptions to the bar on direct recoveries. First, he argues that Fidus owed him special and fiduciary duties because Fidus assumed complete control of his solely-owned business. ECF No. 108 at 8. Second, McCollum claims that his injuries are "separate and distinct," because (1) he was "squeeze[d] out of any financial benefit" from OMC; and (2) he was exposed individually to a $10 million liability because of Fidus' conduct. *Id.*

### a. Special / Fiduciary Duty

McCollum first claims that Fidus owed him a fiduciary duty because Fidus took "complete control" of his solely-owned business. *See* ECF No. 108 at 8. Fidus, in response, argues that any such duty ran to Oaktree Medical Center, P.C., not to McCollum, and cites a North Carolina Business Court case to that effect. ECF No. 111 at 5 (citing *Timbercreek Land & Timber Co., LLC v. Robbins*, 17 CVS 140, 2017 WL 3214427 (N.C. Super. Ct. Jul. 28, 2017).

Under South Carolina law, a special or fiduciary relationship exists "when one reposes special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing confidence."[8] *O'Shea v. Lesser*, 416 S.E.2d 629, 631 (S.C. 1992) (citation omitted). Fiduciaries are "in a superior position to the other," enabling them to "exercise influence" over the trusting party. *Burwell v. S.C. Nat'l Bank*, 340 S.E.2d 786, 790 (S.C. 1986). "[M]ere respect for another's judgment or trust in . . . character is usually not sufficient to establish [a fiduciary] relationship. The facts and

---

[7] Fidus argues that South Carolina law applies, but cites only North Carolina law, "indulg[ing] McCollum. ECF No. 111 at 4 n.1.

[8] McCollum argues that the existence of a fiduciary duty is a jury question. ECF No. 108 at 14 n.4. That is incorrect. Whether such a duty exists is a question of law for the Court; whether there is a *breach* of the duty is generally a question for the jury. *Hendricks v. Clemson*, 578 S.E.2d 711, 715 (S.C. 2003).

circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party." *Id*.

The Fourth Circuit, describing North and South Carolina law together, has identified two categories of special duties in the corporate mismanagement context. *See Rivers v. Wachovia Corp.*, 665 F.3d 610, 618 (4th Cir. 2011). First, a special duty may arise when misrepresentations by a defendant cause a plaintiff to become a corporate shareholder. *Id*. And second, majority shareholders in closely held corporations may have special duties towards minority shareholders. *Id*.

Neither Fidus nor the third-party defendants owed any fiduciary duty to McCollum. McCollum could not have any reasonable basis for believing that Fidus was acting in his personal interest. *See Burwell*, 340 S.E.2d at 790. Nor does this case fall into either of the two scenarios identified in *Rivers*: Fidus did not induce McCollum to personally guarantee the loan to OMC, P.C. via any misrepresentations. And McCollum was not a minority shareholder shunted aside by a majority shareholder. To the extent that any fiduciary duty existed because Fidus "held all the cards," any such duty would run to OMC, P.C., not to McCollum.

### b. Separate and Distinct Injury

McCollum also claims that he can bring a direct stockholder action because he incurred a "separate and distinct" injury. McCollum points to two buckets of "separate" injuries: (1) being "squeezed out of any financial benefit" from OMC; and (2) being "exposed" to liability under the guarantee.

The first bucket is unavailing because the business' failure was an injury to the corporation, not to McCollum. *See Rivers*, 665 F.3d at 618 (rejecting claim that mismanagement

10

Case 3:19-cv-00312-GCM    Document 132    Filed 11/01/22    Page 10 of 20

circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party." *Id*.

The Fourth Circuit, describing North and South Carolina law together, has identified two categories of special duties in the corporate mismanagement context. *See Rivers v. Wachovia Corp.*, 665 F.3d 610, 618 (4th Cir. 2011). First, a special duty may arise when misrepresentations by a defendant cause a plaintiff to become a corporate shareholder. *Id*. And second, majority shareholders in closely held corporations may have special duties towards minority shareholders. *Id*.

Neither Fidus nor the third-party defendants owed any fiduciary duty to McCollum. McCollum could not have any reasonable basis for believing that Fidus was acting in his personal interest. *See Burwell*, 340 S.E.2d at 790. Nor does this case fall into either of the two scenarios identified in *Rivers*: Fidus did not induce McCollum to personally guarantee the loan to OMC, P.C. via any misrepresentations. And McCollum was not a minority shareholder shunted aside by a majority shareholder. To the extent that any fiduciary duty existed because Fidus "held all the cards," any such duty would run to OMC, P.C., not to McCollum.

### b. Separate and Distinct Injury

McCollum also claims that he can bring a direct stockholder action because he incurred a "separate and distinct" injury. McCollum points to two buckets of "separate" injuries: (1) being "squeezed out of any financial benefit" from OMC; and (2) being "exposed" to liability under the guarantee.

The first bucket is unavailing because the business' failure was an injury to the corporation, not to McCollum. *See Rivers*, 665 F.3d at 618 (rejecting claim that mismanagement

harmed plaintiff individually because "monetary loss was common to every shareholder"). In *Rice-Marko v. Wachovia Corp.*, the South Carolina Court of Appeals upheld dismissal of a suit predicated on misrepresentations that resulted in lower share prices. *See* 728 S.E.2d 61, 66–67 (S.C. Ct. App. 2012). The diminution in share prices was "precisely the same injury suffered by the corporation itself." *Id*. (citing *Barger v. McCoy Hillard & Parks*, 488 S.E.2d 215, 220 (N.C. 1997)).

Similarly, McCollum's personal guarantee of the loan does not confer any "separate and distinct" injury. That is because under the majority rule, "guarantors of a corporation's debts ordinarily may not pursue individual actions to recover damages for injuries to the corporation." *Barger v. McCoy Hillard & Parks*, 488 S.E.2d 215, 221 (N.C. 1997).

In sum, because neither of the two exceptions to the general rule is likely to apply, McCollum's counterclaims are derivative in substance. As such, McCollum lacks standing to bring a stockholder action asserting corporate mismanagement. *See Carolina First Corp. v. Whittle*, 539 S.E.2d 402, 407 (S.C. Ct. App. 2000) (affirming dismissal based on failure to allege compliance with state demand requirement). His counterclaims will be dismissed.[9]

---

[9] McCollum sought leave to amend his counterclaims in the event that South Carolina law were deemed applicable. *See* ECF No. 108 at 6. He also asks for dismissal without prejudice to permit the amendment. *Id*. at 24. The Court will not permit amendment, and dismissal will be with prejudice.

"A district court may deny a motion to amend when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile." *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010). Here, amendment would be both futile and prejudicial. Starting with futility, North Carolina and South Carolina law reach the same result on the topic of derivative and direct standing. The parties recognize that fact, arguing the case law interchangeably. *See, e.g.*, ECF No. 108 at 8 n.3 (noting that South Carolina applies the same law on shareholder suits). Finally, amendment would be prejudicial to the opposing parties, resetting the clock on a glacially-paced case and causing the parties to incur yet more expenses.

### c. Third Party Claims

McCollum's third-party claims are similarly derivative in substance. As a practical matter, McCollum asserts essentially the same claims against the third-party defendants as he does against Fidus. He casts the Third-Party Defendants as Fidus' minions, driving his company into bankruptcy through incompetent management. *See id.* ¶¶ 50–51, 66, 72. At Fidus' direction, McCollum claims that the Third-Party Defendants "solved nothing, [took] little action, and only marched OMC to bankruptcy." *Id.* ¶ 72.

As with his counterclaims, McCollum cannot show a special duty or a "separate and distinct injury" sufficient to obtain a direct recovery. First, McCollum claims that "the allegations that the Third-Party Defendants and Fidus were acting in concert . . . establish a special fiduciary duty upon which McCollum can sue individually." ECF No. 109 at 11. McCollum argues that that duty arose from a "control imbalance" because "Fidus, Drivetrain, Daileader, and Huron wrested complete control of OMC from McCollum during 2018." *Id.* And McCollum cites *Norman v. Nash Johnson & Sons' Farms, Inc.*, 537 S.E.2d 248 (N.C. Ct. App. 2000), which he says "stands for the general principle that when owners of a small corporation are powerless against those controlling it, they should be able to individually sue the wrongdoers to overcome that imbalance of control."

Not so. *Norman* addressed the circumstances under which minority shareholders in closely held corporations could bring individual claims against *majority shareholders*. *Id.* at 253. As discussed earlier, majority oppression of minority shareholders in closely held corporations is a prototypical example giving rise to special duties. *See Rivers*, 665 F.3d at 618. This case does not present any such scenario.

McCollum next argues that he incurred a "separate and distinct injury" from the third-party defendants because (1) their action made him liable on the guarantee and (2) he suffered

12

reputational damages related to the failure of his solely-owned business.[10] For the reasons already discussed, McCollum's liability on the guarantee does not constitute a separate and distinct injury. And McCollum cannot point to any case law identifying reputational damage to a shareholder as a separate and distinct injury. *See Audio Odyssey, Ltd. V. Brenton First Nat'l Bank*, 245 F.3d 721, 729 (8th Cir. 2001) ("Doubtless a sole shareholder may suffer shame and humiliation when a corporation is destroyed, but an 'emotional injury' exception would swallow the rule against shareholder standing.").

In short, McCollum's third-party claims principally allege corporate mismanagement—a claim that belongs to OMC, P.C., not to McCollum as an individual shareholder. Because McCollum cannot show that the Third-Party Defendants had any special duties to him, or that he had any "separate and distinct injury" apart from that inflicted on the corporation, McCollum lacks standing to bring his third-party claims. Those claims will be dismissed.

### ii. Improper Impleader

As separate grounds for dismissal of the third-party complaint, Third-Party Defendants argue that their impleader is improper under Rule 14 of the Federal Rules of Civil Procedure. The Court agrees.

Rule 14 provides that a "defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." Fed. R. Civ. P. 14(a)(1). The rule hinges on derivative theories of liability: To show that a

---

[10] McCollum also appears to argue that because he was the sole owner of OMC entities, a derivative recovery would be meaningless because any such recovery would go exclusively to him. ECF No. 109 at 12. This argument discounts the corporate form entirely, and the Court rejects it without further discussion. *See Hunting v. Elders*, 597 S.E.2d 803, 806 (S.C. Ct. App. 2004) ("[I]t is recognized that a corporation is an entity, separate and distinct from its officers and stockholders . . . .").

13

nonparty is "liable to it for all or part of the claim" against the third-party plaintiff, there must be a legal obligation created via indemnification, contribution, subrogation, warranty, or some other derivative device. *See Watergate Landmark Condominium Ass'n. v. Wiss, Janey, Elstner Assocs., Inc.*, 117 F.R.D. 576, 578 (E.D. Va. 1987). "Derivative liability is central to the operation of Rule 14. It cannot be used as a device to bring into a controversy matters which merely happen to have some relationship to the original action."[11] *Id.*; *see also* 3 Moore's Federal Practice – Civil § 14.04(3)(a) (2022) ("An impleader claim may not be used to assert any and all rights to recovery arising from the same transaction or occurrence as the underlying action.").

McCollum argues that Rule 14 is to be construed liberally and explains that he "expect[s] to be made whole" by the Third-Party Defendants in the event that he is found liable under the Guaranty. ECF No. 109 at 6. But McCollum's explanation makes clear that there is no basis for impleader here. Because McCollum has not pled any basis for derivative liability, the Third-Party Defendants were improperly impleaded. They will be dismissed.

### iii. Defendants' Motions for Dismissal

Defendants McCollum Business, Grove 1005, LLC, and John Shaw move to dismiss the fraudulent conveyance claims against them, arguing that they fail to state a claim upon which relief can be granted. Defendants also seek to dismiss Fidus' claim for injunctive relief. The Court will deny the motions to dismiss.

---

[11] To be sure, once a proper third-party claim exists, the plaintiff may join additional claims "arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff." Fed. R. Civ. P. 14(a)(3).

14

### 1. Fraudulent Conveyance

Defendants first move to dismiss Fidus' fraudulent conveyance action. As a reminder, Fidus claims that McCollum transferred his sole membership interest in Grove 1005, LLC to John Shaw ("the LLC transfer"). Two months after that, Shaw caused Grove 1005 to sell its principal asset, a building, for $3.825 million. And Shaw then caused Grove 1005 to "loan" $2.76 million back to a McCollum-owned entity, McCollum Business LLC ("the mortgage transfer"). Fidus says that McCollum orchestrated these moves to evade creditors, noting that McCollum transferred his membership interest less than six months after being sued in this case. "By transferring [his] interest to Shaw, and by Shaw's causing Grove 1005 to loan the bulk of the sales proceeds from its real estate transaction to another LLC in which McCollum owns the sole membership interest, the Defendants have managed to transform McCollum's sole asset into McCollum Business' substantial debt." ECF No. 48 ¶ 39.

Defendants' arguments for dismissal primarily hinge on North Carolina statutory law. The North Carolina fraudulent conveyance statute contemplates "a conveyance by a debtor, made with the intent to defraud a creditor." *See* ECF No. 65 at 7 (citing N.C. Gen. Stat. § 39-23.4). Those terms are defined by statute. McCollum Business, Grove 1005, LLC, and John Shaw argue that they are not "debtors," and Fidus is not a "creditor" under the relevant definitions.

Unfortunately for Defendants, South Carolina law, not North Carolina, governs this claim. South Carolina's fraudulent conveyance statute, the Statute of Elizabeth,[12] provides: "Every gift, grant, alienation, bargain, transfer, and conveyance of lands . . . for any intent or purpose to delay,

---

[12] The name refers to a predecessor statute adopted in England in 1571. *See In re Medina*, 619 B.R. 236, 241 n.4 (B.A.P. 9th Cir. 2020) (discussing historical origin of the Statute of Elizabeth).

hinder, or defraud creditors and others of their just and lawful actions, suits, debts, damages, penalties, and forfeitures must be deemed and taken . . . to be clearly and utterly void . . . ." S.C. Code Ann. § 27-23-10(A). The Court has no trouble in concluding that Fidus plausibly alleges fraudulent conveyance under this statute.

Defendants also argue that the fraudulent conveyance claims should be dismissed for failing to adequately allege fraud under Rule 9(b)'s heightened pleading standards. Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud," although intent may be alleged generally. Fed R. Civ. P. 9(b).

As a preliminary matter, the Fourth Circuit has not decided whether fraudulent conveyances trigger Rule 9(b)'s heightened pleading standard. *See In re Life Partners Holdings, Inc.*, 926 F.3d 103, 118 (5th Cir. 2019). Some courts claim that all fraudulent conveyances trigger Rule 9(b). *See In re Air Cargo, Inc.*, 401 B.R. 178, 192 n.7 (Bankr. D. Md. 2008). But the greater weight of authority finds that *actual* fraudulent transfer claims are governed by Rule 9(b), whereas *constructive* fraudulent transfer cases are not. *See id.* ("A larger, second line of cases . . . only applies Rule 9(b) to complaints that allege actual fraud."); *In re Tronox, Inc.*, 429 B.R. 73, 96 (Bankr. S.D.N.Y. 2010) ("[T]he overwhelming weight of authority is that the heightened pleading requirements of Rule 9(b) are inapplicable [to constructive fraudulent conveyance claims].").

The Court needs not wade into the debate. Even under Rule 9(b)'s more rigorous pleading requirement, the facts underpinning the alleged fraudulent conveyances are adequately pled to survive dismissal. Fidus identifies "the time, place, and contents" of the challenged transfers, including the identities of the relevant parties and what the parties obtained as a result of the transfers. *Cf. Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (explaining pleading standards for a fraud claim).

16

Many of the perceived deficiencies in Fidus' fraudulent conveyance claim relate to insufficient pleading of intent. But Rule 9(b) "allows conclusory allegations of [a] defendant's knowledge as to the true facts and of defendant's intent to deceive." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). And as the Fourth Circuit has cautioned, courts "should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [the defendant] will have to prepare a defense at trial; and (2) the plaintiff has substantial pre-discovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). The Court is amply satisfied of those factors here. Accordingly, the motion to dismiss Fidus' fraudulent transfer claim will be denied.

## 2. Injunctive Relief

Defendants McCollum Business, Grove 1005, LLC, and John Shaw seek to dismiss Fidus' claim for preliminary and permanent injunctive relief. These three defendants claim that because Fidus cannot show a fraudulent conveyance under North Carolina law, Fidus cannot show the requisite "likelihood of success on the merits" to obtain injunctive relief. ECF No. 65 at 12; ECF No. 69 at 10. Because Fidus plausibly states a claim for fraudulent conveyance under South Carolina's Statute of Elizabeth, there is no merit to his argument.

McCollum Business also argues for the first time in reply that Fidus cannot show an "irreparable injury" sufficient to give rise to equitable relief, because damages are an adequate remedy for the harm alleged. *See* ECF No. 106 at 9. The Court will decline to consider this argument. *See Clawson v. FedEx Ground Package Sys.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered."). In any event, the parties' argument on this point is

17

undeveloped and premature, as Fidus has not yet moved for a preliminary injunction. Should such a motion come before the Court, the parties will be free to brief this issue anew.

### iv. McCollum's Jury Demand

Finally, Fidus asks the Court to strike McCollum's jury demand, arguing that he waived the right to a jury trial under the Guaranty. *See* ECF No. 75 at 22 (citing ECF No. 48-2 at 11). In the briefing on this issue, the parties debate whether New York or North Carolina law applies to the jury waiver, apparently employing the *lex loci* test as discussed earlier. But under the *Erie* doctrine, federal courts sitting in diversity apply federal procedural law, and jury waivers are a procedural right. *See County of Orange v. United States District Court*, 784 F.3d 520, 526–29 (9th Cir. 2015); *see also Leasing Service Corp. v. Crane*, 804 F.2d 828, 832 (4th Cir. 1986) (citing U.S. Const. amend. VII). So the appropriate question is not whether North Carolina or New York courts would enforce the jury waiver, but whether federal courts would do so.

Federal law does permit the jury trial right to be "knowingly and intentionally waived by contract." *Id*. "In light of the strong federal policy favoring jury trials, however, courts have typically indulged every reasonable presumption against waiver." *Mowbray v. Zumot*, 536 F. Supp. 2d 617, 620 (D. Md. 2008) (citing *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 392 (1937) (cleaned up).

Here, McCollum's waiver certainly appears to be both knowing and intentional. The waiver clause in question appeared in all bold and capitals, conspicuously displayed on the ninth page of the 14-page agreement. ECF No. 48-2 at 10. It unequivocally stated: "**EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING**" related to the Guaranty. *Id*. And there is no

18

indication that the Guaranty was not a bargained-for, arms-length transaction. McCollum accordingly waived his right to a jury trial.[13] *See Leasing Services Corp.*, 804 F.2d at 833 (enforcing a waiver because the provision was conspicuous, the parties were not "manifestly unequal," and the parties had negotiated the contract at issue).

III. ORDER

**IT IS THEREFORE ORDERED THAT:**

1. Defendant McCollum Business' Motion to Dismiss (ECF No. 65) is **DENIED**.

2. Defendants Grove 1005, LLC, and John Shaw's Motion to Dismiss (ECF No. 69) is **DENIED**.

3. Plaintiff Fidus Investment Corporation and West Investment Foreign Shares, LLC's Motion to Dismiss Amended Counterclaims (ECF No. 74) is **GRANTED**, and Defendant Daniel McCollum's Amended Counterclaims (ECF No. 66) are **DISMISSED**.

4. Third-Party Defendant Tim Daileader and Drivetrain LLC's Motion to Dismiss Amended Third-Party Complaint (ECF No. 78) is **GRANTED**.

5. Third-Party Defendant Huron Consulting Group, LLC's Motion for Transfer to Compel Arbitration or to Strike or Dismiss McCollum's Amended Third-Party Complaint (ECF No. 80) is **GRANTED** as stated in this Order.

6. Third-Party Plaintiff McCollum's Amended Third-Party Complaint (ECF No. 117) is **DISMISSED**.

7. Defendant McCollum's demand for trial by jury is **STRICKEN**.

---

[13] At this juncture, this finding may be of little practical effect since other defendants have demanded trial by jury. *See* ECF No. 70 at 8 (jury demand by Defendants John Shaw and Grove 1005, LLC).

**SO ORDERED.**

Signed: November 1, 2022

Graham C. Mullen
United States District Judge